PITTSBURGH PLATE GLASS COMPANY v. THOMAS C. FORBES AND WIFE EVELYN B. FORBES, TR. AS TOWN HOUSE MOTEL.

(Filed 11 January 1963.)

1. **Bankruptcy § 5; Laborers' and Materialmen's Liens § 6—**

Perfected liens for labor and materials are not impaired by the fact that the owner of the property is adjudged bankrupt within four months thereafter. G.S. 1-339.68(b).

2. **Execution § 13; Judicial Sales § 5—**

A purchaser at a judicial sale acquires the property subject to liens having priority over the judgment under which the sale is held.

3. **Same—**

Prior to confirmation, the purchaser at a judicial sale acquires no title or rights, and neither the judgment debtor nor the judgment creditor, or those claiming under them, may seek to compel him to comply with his bid.

4. **Execution § 13; Judicial Sales § 4—**

While *caveat emptor* applies to a judicial sale, the court has the power in its equity jurisdiction to protect the purchaser from imposition because of fraud or mistake, and may relieve him of his obligation when the ends of justice so require.

5. **Same—**

A prospective purchaser at an execution sale was advised by counsel for the judgment debtor, to the judgment debtor's knowledge, that the purchase price would be used to pay off prior liens and that he would obtain the property free of encumbrances. Upon learning the facts, the purchaser procured a resale and meanwhile purchased the judgment and had it assigned to himself, and directed the sheriff to return the execution with notation that it had been withdrawn, all before time for confirmation. *Held:* The court in its equity jurisdiction had authority to relieve the bidder of his obligation to comply with his bid and to direct the refund of the deposit for the resale.

APPEAL by movant from *Walker, S.J.,* May 1962 Civil Term of LEE.

This is an appeal from an order refusing to require Carl Meares and Clarence Tart (hereafter respondents) to purchase and pay for real

estate sold under execution issued in the captioned cause. Jimmy Love, trustee in bankruptcy (hereafter movant), by motion sought an order compelling respondents to comply with their bid.

The parties stipulated the facts, which so far as pertinent are summarized as follows: Defendants Forbes, in August 1958, purchased a lot in Lee County. During 1960 they constructed a motel on this property known as Town House Motel. Plaintiff's labor and material went into the construction of the motel. In apt time it filed its notice and claim of lien in the office of the Superior Court of Lee County. In due time it instituted this action to enforce the statutory lien. On 7 June 1961 the clerk of the Superior Court of Lee County, with the consent of the individual defendants and their counsel, entered judgment fixing the sum owing plaintiff by defendants at $6,249.95. It was also declared a specific lien against the property described in the complaint (the land now in controversy) securing payment of said sum. The fair market value of the property was $126,000. Plaintiff's lien was subordinate to the lien of a mortgage securing the principal sum of $35,000 and judgments aggregating $43,801.88. Plaintiff's judgment had priority over judgments subsequently rendered against defendants Forbes aggregating several thousand dollars. In addition to the debts secured by liens, defendants Forbes owed unsecured creditors an amount in excess of $40,000. Plaintiff caused execution to issue on its judgment. Acting pursuant thereto, the sheriff advertised for sale land on which plaintiff had a specific lien for labor and material. The auction was held on 20 September 1961. W. H. Johnson and Carl Meares were the high bidders in the sum of $120,000. Before placing a bid on the property, respondent Meares made inquiry of defendants and their counsel about the property. He was informed of the prior liens (mortgage and judgment) approximating $80,000. Counsel for defendants "advised, counseled and represented to the said Meares that if the amount bid at the execution sale, under the judgment rendered in this cause, was as much or more than the amount of the older judgments and deed of trust, that the proceeds of the sale would be applied in discharge of those judgments and deed of trust and that the purchaser would receive a good free and unencumbered title to said property." This statement was made with the expectation that Meares would rely on it. He did rely on it when he bid $120,000 for the property on 20 September. On 29 September 1961 Meares received a telephone call from counsel for defendants informing Meares that defendants were preparing to file voluntary petition in bankruptcy, it would be better for Meares to purchase the property in the bankruptcy proceeding, and that the property could be purchased cheaper in the bankruptcy proceeding than at the execution sale. It was suggested that Meares should file an upset

bid. "Acting in response to the request of the defendant Forbes and Mr. Gavin to file an upset bid and acting in reliance upon the representations of Mr. Gavin (defendants' attorney) that a bankruptcy proceeding would be filed which would avoid the entire execution sale in Lee County, and also acting in further reliance upon the representations of Mr. Gavin that respondent Meares would have obtained a good and unencumbered title to the property of defendants if the sale was not avoided, respondent Meares caused the respondent Tart to send to the office of Mr. Gavin funds for a deposit on an upset bid. . ." The $6,050 necessary to secure a resale was deposited with the clerk, whereupon he ordered a resale, and the sheriff readvertised the property for sale on 20 October 1961. The sheriff received no other bid. He declared Tart the high bidder and so reported to the clerk. Tart, in making the deposit and request for a resale, was acting as agent for respondent Meares. Before the time expired for consummation of the bid at the auction held 20 October 1961, Meares learned that the sheriff would have no authority to use the purchase money in discharging prior liens, and the purchaser would take title subject to the prior liens. When so informed, Meares promptly consulted counsel in his effort to be relieved of the bid made for him by Tart. He purchased plaintiff's judgment and took an assignment. He then notified the sheriff and court officials that he desired to withdraw the execution under which the sales were made. He paid the sheriff and other officials their fees. The sheriff returned the executions, noting the fact that they were withdrawn at the request of plaintiff's assignee. Thereupon Meares requested the clerk to refund him the deposit made to increase the bid. The clerk, being dubious as to the course he should pursue, referred the matter to Judge Williams, resident judge of the district. He issued an order directing the clerk to refund the deposit. The clerk complied with Judge Williams' order. The direction to return the execution as unsatisfied and the refund of the deposit were within the ten-day period permitted for the filing of increased bids and before the bid of 20 October 1961 could be accepted and conveyance directed.

On 5 October 1961 defendants filed a voluntary petition and were adjudged bankrupts by the United States District Court for the Middle District of North Carolina. On 6 October 1961 the United States Court appointed S. Ray Byerly as receiver with directions to take possession of the bankrupts' properties. He complied with the court order, took possession of the property here in controversy, operated it as a motel, and appointed defendants as his agents to operate it. He collected the rents and profits. His possession antedated the auction of 20 October 1961 by several days.

On 19 December 1961 movant applied to the clerk of the Superior Court of Lee County for an order accepting the upset bid made by

Tart of $126,050 and for a further order requiring the sheriff to tender respondents a deed for the property subject to all liens having priority over the lien adjudged in this action. The clerk denied the motion. Movant appealed to the Superior Court in term. It denied the motion. Movant excepted and appealed.

*Booth, Osteen, Upchurch and Fish and W. D. Sabiston, Jr., by W. D. Sabiston, Jr., for movant Love.*
*Smith, Moore, Smith, Schell & Hunter by McNeill Smith and Richmon G. Bernhardt, Jr., for respondent appellees.*

RODMAN, J. The fact that defendants were adjudged bankrupts within four months from the date the amount owing and the liens securing payment were judicially declared did not impair plaintiff's lien. Sec. 67b of the National Bankruptcy Act, 11 USCA 107b. What effect, if any, the actual possession of the property by the receiver appointed by the bankruptcy court had on the right of the sheriff to make a valid offer of sale on 20 October 1961 need not be determined since we think the judgment should be affirmed for the reasons hereafter stated.

A sheriff, acting pursuant to an execution, can only sell the rights and estate of the judgment debtor as they existed when the lien pursuant to which he acts became effective. G.S. 1-339.68(b). Our statutes regulating such sales, G.S. 1-339.51 *et. seq.* contemplate a sale at which the thing sold will bring its fair value. The high bidder at the auction acquires no right until his bid is accepted and the sale confirmed. G.S. 1-339.67. If competitive bidding is stifled, resulting in a bid less than the fair value of the property sold, the clerk may decline to confirm the sale. *Federated Textiles v. Shirt Corp.*, 206 N.C. 471, 174 S.E. 290; *Beckwith v. Mining Co.*, 87 N.C. 155.

Courts are as diligent in protecting purchasers from imposition because of fraud or mistake as they are in protecting judgment debtors in similar situations. While the doctrine of caveat emptor applies to purchasers at execution sales, it does not tie the hands of a court to prevent a manifest injustice not due to the fault or neglect of the purchaser. The limitation on the rule is well illustrated in *Clayton v. Glover*, 56 N.C. 371. There a slave was sold under execution. Defendant Glover bid $1,000 for the slave but refused to comply with his bid. The slave had defective vision. His fair value was only $500. The sheriff, in reporting the sale, said: "At the time of the sale, and in the hearing of all persons present, the undersigned made known that there was a defect in each of said slave's eyes, and called up the said slave so near the stand that all persons present could see the said defect, which was patent." Glover testified that he was not present when the

announcement was made by the sheriff and had no knowledge of the defect. He sought to withdraw his bid. His motion was denied for the reason there was no warranty of soundness. This Court reversed the lower court. Battle, J., said: "The court of equity has, undoubtedly, the power to set aside a judicial sale made in pursuance of its order whenever the owner of the property, or those who act for him, can show that the price bid is inadequate, and it would seem that in fairness, the court ought to have the corresponding power to relieve a purchaser whenever from fraud and mistake he has bid too much for the property; and such, from the authorities, we find to be the case. (Citing authorities) The sale being made under its authority, the Court will see that justice shall be done to both vendor and purchaser upon the fairest principles of equity and good conscience."

*Webster v. Haworth*, 8 Cal. 21, 68 Am. Dec. 287, is factually similar to the case under consideration. There plaintiff, sheriff, brought suit to recover the amount bid by defendant for land sold under execution. There one Ryer, judgment creditor at whose instance the sale was made, informed defendant that his judgment was the first lien on the property. That statement was not correct. Defendant bid for the property, relying upon the statement so made. Murray, C.J., said: "In this view of the case, it is immaterial whether Ryer made such representations, knowing them to be false, or whether he was ignorant of the facts altogether: 1 Story's Eq. Jur., sec. 193. It is sufficient if they were untrue, and at the same time a material inducement to the purchase, and that the defendant acted on the faith of them, which is indubitably true. It is said that the maxim caveat emptor applies to judicial sales, and that the defendant cannot avail himself of the misrepresentations of the plaintiff, as he had access to the records of the county, and might have informed himself on the subject. Grant that the maxim caveat emptor applies to sheriffs' sales, it has never been carried to the extent that such a sale could not be impeached on the ground of fraud or misrepresentation. The maxim only applies thus far, that the purchaser is supposed to know what he is buying, and does so at his own risk. But this presumption may be overcome by actual evidence of fraud, or it may be shown that in fact the party did not know the condition of the thing purchased, and was induced to buy upon the faith of the representations made by those who by their peculiar relations to the subject, were supposed to be thoroughly acquainted with it. The fact that the defendant might have examined the public records does not alter the case."

The principles announced in those cases have been applied to many different factual situations. *Nash v. Hospital Co.*, 180 N.C. 59, 104 S.E. 33; *Davis v. Keen*, 142 N.C. 496; *McDowell v. Simms*, 41 N.C.

278; *Woods v. Hall,* 16 N.C. 411; *Smith v. Greenlee,* 13 N.C. 126; *Hayes v. Stiger,* 29 N.J. Eq. 196; *Paulett v. Peabody,* 3 Neb. 196; *Fisher v. Hershey,* 17 Hun. 370 (N.Y.); *Masson v. Bovet,* 1 Denio 69 (N.Y.), 43 Am. Dec. 651; *Veazie v. Williams,* 8 Howard 148, 12 L. ed. 1018; *Hayward v. Wemple,* 136 N.Y.S. 625; *Lane v. Chantilly Corp.,* 167 N.E. 578, 68 A.L.R. 653. The general subject of the doctrine of caveat emptor as applied to purchasers at judicial sales is the subject of an annotation in 68 A.L.R. 659.

Respondents' bid represents the fair value of the property rights which Meares was told he would acquire if the high bidder. It is now insisted that he must increase his bid by 65% ($80,000) to get what he was led to believe he would acquire. He was induced to make this bid by statements by counsel for and with the knowledge of the judgment debtor. When informed the amount bid would not be applied to pay prior liens, he was diligent in seeking relief. He acquired the judgment under which the sale was made. He then directed the sheriff to return the execution with the notation that it had been withdrawn at his request as assignee of the judgment creditor. This was done. All of these steps were taken before the court confirmed the sale. Meares then sought a refund of the deposit which he had made. The court was informed of the reasons which prompted respondents to act. The clerk, dubious of his authority, referred the matter to the judge of the Superior Court. It is unnecessary to inquire whether the clerk lacked authority to act. Unquestionably the judge of the Superior Court did have such authority, when the clerk referred the matter to him. The order directing a refund of the deposit to obtain a resale discharged respondents of any obligation to purchase the property at that price.

Until the sale was confirmed, neither the judgment debtor nor those claiming under him acquired any rights by virtue of the auction. It is not now necessary to determine whether a judgment creditor who has made an upset bid causing a resale may, without the consent of the court, relieve himself of his obligation by ordering the execution returned "unsatisfied." The admitted facts justified the court in relieving respondents of the obligation assumed when they sought a resale. The judgment is

Affirmed.